UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO.: 4:19−CV−40156−DHH

| | |
|---|---|
| BUSINESS EXPOSURE REDUCTION GROUP (BERG) ASSOCIATES, LLC<br>              Plaintiff,<br><br>v.<br><br>PERSHING SQUARE CAPITAL MANAGEMENT, L.P.<br>              Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF JOHN F. MOYNIHAN
## IN OPPOSITION TO MOTION TO DISMISS

I, John F. Moynihan, on oath depose and state as follows:

1. I have personal knowledge of the facts stated herein.

2. I was a co-manager of Plaintiff, Business Exposure Reduction Group Associates, LLC (hereinafter "BERG"), throughout our investigative work for Defendant, Pershing Square Capital Management, L.P. (hereinafter "PSCM").

3. Larry Johnson was the other manager of BERG and he worked out of his apartment in Pompano Beach, Florida.

4. I was a founder of BERG and was one of its principal investigators. I am a lifelong resident of Worcester, Massachusetts, where I lived and worked throughout the period of the formation and performance of the Fee Agreement in question with PSCM (herein "Fee Agreement").

5. PSCM sought the assistance of BERG in connection with its short position on Herbalife stock. PSCM knew I resided in and worked out of Worcester.

6. BERG informed PSCM during the negotiations of the engagement that I was based in Massachusetts. A true copy of an email to that affect dated December 3, 2013 is attached hereto as Exhibit A.

7. PSCM solicited BERG to conduct the investigations. On or about December 3rd and 4th, 2013, Elizabeth Mann, a representative of PSCM, contacted Larry Johnson by email and phone.

8. Mann had gotten a referral to BERG, and she indicated she was interested in its services for PSCM's Herbalife position.

9. A conference call ensued which I participated in from Worcester.

10. Then I traveled from Worcester, and Johnson traveled from Washington DC, to New York City to meet with Mr. William Ackman and other PSCM representatives.

11. It was agreed at the meeting that BERG would draft a fee agreement, and Johnson and I worked on that letter agreement from our respective home offices.

12. The document that became the parties' Fee Agreement was signed through an email exchange of PDF versions of the final agreement.

13. BERG did not discuss with PSCM the notion of starting a litigation related to Herbalife when negotiating the Fee Agreement, and litigation was never mentioned in or contemplated by the Fee Agreement.

14. The plan that was discussed and outlined in the Fee Agreement does not mention a litigation strategy at all.

- 3 -

15. In the Fee Agreement, drafted by BERG, BERG does use the word "case" to describe its engagement. However, BERG refers to all its engagements as "cases". It is simply the word that we use to describe our work on behalf of clients; we use that word to describe any project or engagement.

16. In fact, by the very nature of PSCM's short position in Herbalife, BERG understood that PSCM did not own any shares of stock but rather had "borrowed" them for purposes of exercising its short position.

17. Thus, any sort of shareholder's derivative suit would not have been possible.

18. BERG's investigations were not limited to the jurisdictions that PSCM cites in its Memorandum in Support of its Motion to Dismiss, and BERG has not so alleged in the Complaint.

19. BERG worked in connection with its engagement by PSCM in many jurisdictions including Columbia (South America), Venezuela, Brazil, Mexico, Russia, Florida, New York, Europe and others.

20. Investigative work was done in those places, but a considerable amount of work was done in, and directed from, my office in Worcester, where I would do internet and data base searches, write reports and make the countless number of phone calls and email connections that were required.

21. I sent many emails to PSCM from Worcester, and many were sent from PSCM in New York to Worcester.

22. Several of those emails were sent by me in response to an email inquiry or request from PSCM in New York.

23. For example, on March 27, 2014, Roy Katzovicz of PSCM sent an email to me and Larry Johnson suggesting an angle of investigation or inquiry. A true copy of the email is attached hereto as Exhibit B.

24. On March 18, 2014 Katzovicz forward to me by email a phone message about a person investigating Herbalife, which I responded to with my assessment of the situation. A true copy of the email is attached hereto as Exhibit C.

25. PSCM requested many meetings in New York, and I traveled from Worcester for those meetings, in addition to traveling from Worcester for other work done under the parties' agreement.

26. Thus, PSCM knowing availed itself of the opportunity to work with BERG, which was based largely in Worcester, where I lived.

27. Other professionals, which were investigating Herbalife for PSCM before BERG became involved, had not been successful in uncovering information that negatively affected the Herbalife stock. Thus, the stock climbed from the time that PSCM took its short position.

28. BERG helped alter this course with its discovery of relevant facts not previously known to PSCM.

29. While other factors may have contributed to the betterment of PSCM's financial position, there can be no denying that BERG's work played a role, and PSCM has never denied that it did.

30. When BERG made demand for the performance bonus under the Fee Agreement, Mr. Ackman of PSCM did not deny that a bonus was due. Rather, he asked BERG to wait until PSCM closed its stock position to then settle the matter.

31. Mr. Ackman never questioned BERG's work. He in fact complimented the work and said he was happy with it on many occasions.

32. BERG's invoices for services and expenses were always paid; PSCM never disputed them and never claimed that it was not getting value for the work.

33. PSCM's unilateral determination under the Fee Agreement that BERG's work was not beneficial to the financial standing of PSCM ignores the objective facts, is not taken in good faith, and is clearly taken simply to deny BERG the benefit of its contract.

34. BERG developed a lot of information which it shared with PSCM. One piece of information concerned the connection of Herbalife's operations with drug trafficking and money laundering channels.

35. In order to save money, and apparently to try to avoid the performance bonus payable to BERG, PSCM asked BERG to stand-down in or around March 2015.

36. Thereafter, PSCM took the information that BERG had developed and went directly to the DEA in New York seeking further investigation and prosecution related to Herbalife's marketers and distributors' involvement in money laundering and drug trafficking. Such an action would benefit PSCM by taking the BERG information and delivering it to the government to investigate at no expense to PSCM.

Signed under the pains and penalties of perjury this 22nd day of February 2020,

/s/ John F. Moynihan
_____

Respectfully submitted,

BUSINESS EXPOSURE REDUCTION GROUP (BERG) ASSOCIATES, LLC

By their attorney,

/s/ Thomas J. Scannell
_____
Thomas J. Scannell, Esquire (Mass. BBO# 546224)
Fusaro, Altomare & Ermilio, P.C.
71 Elm Street, Suite 102
Worcester, MA 01609
Telephone No.: (508) 798-3771
Email:  tscannell@faelaw.com

Dated:  February 24, 2020

## CERTIFICATE OF SERVICE

    I hereby certify that I have caused a true copy of the above document to be served upon all counsel of record via the Court's CM/ECF system on February 24, 2020 and that a copy will be sent to those not receiving a notice of electronic filing (or NEF) through the ECF system.

/s/ Thomas J. Scannell
_____