UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BUSINESS EXPOSURE REDUCTION GROUP (BERG) ASSOCIATES, LLC, | 20 Civ. 10053 (PAE) |
| Plaintiff, | OPINION & ORDER |
| -v- | |
| PERSHING SQUARE CAPITAL MANAGEMENT, L.P., | |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

In late 2013, plaintiff Business Exposure Reduction Group Associates, LLC ("BERG"), an investigative firm, contracted with defendant Pershing Square Capital Management ("Pershing"), a hedge fund, to conduct research for Pershing regarding Pershing's well-publicized "short" position in Herbalife, Ltd. ("Herbalife"). The parties' agreement provided that Pershing would pay BERG on an hourly basis, and that in certain circumstances, BERG's hourly rate would jump from $200 per hour to $750 per hour. Ultimately, however, exercising the discretion it claims to have been granted by the parties' agreement, Pershing decided that such a "success fee" was not warranted. That decision, BERG alleges here, breached the parties' contract and the implied covenant of good faith and fair dealing.

Before the Court is Pershing's motion to dismiss BERG's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons that follow, the Court grants that motion.

## I.    Background

### A.    Factual Background[1]

#### 1.    Parties

BERG is a Florida limited liability company ("LLC") whose sole member resides in Florida. Am. Compl. ¶ 1; Dkt. 49. It provides "consulting, forensic accounting, and related investigative work" for third parties. Am. Compl. ¶ 7. Pershing is a Delaware limited partnership and investment firm with a principal place of business in New York, New York. *Id.* ¶¶ 2, 6. Its partners reside in New York, New Jersey, Connecticut, Texas, Pennsylvania, Massachusetts, and Illinois; none is a citizen of Florida. Dkt. 50 ¶ 3.

#### 2.    Pershing's "Short" Position and Agreement with BERG

In May 2012, Pershing took a short position on Herbalife. *See* Am. Compl. ¶ 19. At some point before December 2013, Pershing reached out to BERG about engaging BERG to investigate "the conduct and business activities of Herbalife" and Herbalife's distribution network. *Id.* ¶¶ 10–11. Pershing sought to use BERG's research for managing its investments and, specifically, for evaluating and making investment decisions regarding its position in Herbalife. *Id.* ¶¶ 10–11, 19.

---

[1] The Court draws its account of the underlying facts from the Amended Complaint. Dkt. 52 ("Am. Compl."). On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of the plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also considers any documents that the Amended Complaint incorporates by reference. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). Here, the Amended Complaint incorporates by reference and makes integral the parties' written Fee Agreement, which Pershing filed in connection with its motion to dismiss. *See* Dkt. 54 ("Coffey Decl."), Ex. C ("Fee Agr."). The Court thus considers that agreement in resolving Pershing's motion.

On December 2, 2013, BERG presented Pershing with a fee agreement. *Id.* ¶ 12.

Pershing requested modifications to that agreement. *Id.* ¶ 13. On or about December 17, 2013,

BERG produced a revised agreement. *Id.* ¶ 14. On December 23, 2013, after further

modifications, BERG and Pershing executed the Fee Agreement. *Id.* ¶ 15.

The Fee Agreement states that Pershing would pay BERG an hourly rate of $200 per man

hour worked. Fee Agr. at 4. It also provides, in the provision at the heart of the instant dispute,

for an increase to that rate "[i]n the event the case developed by BERG Associates is settled or

resolved in a manner that [Pershing] determines is beneficial to the financial standing of

[Pershing] . . . ." *Id.* In such case, BERG's hourly rate would jump to $750 per hour. *Id.*

However, it states, "[t]he decision regarding the 'beneficial status' will be made by [Pershing]

based on its evaluation of the work product delivered by BERG Associates." *Id.*[2] Pershing paid

the $200-per-hour base fee "in full throughout the engagement." *Id.* ¶ 40.

### 3. BERG'S Investigation and Demand for Success Fee

After the execution of the Fee Agreement, BERG began investigating Herbalife. *Id.* ¶ 26.

BERG's research revealed, among other things: (1) tax and fraud issues with respect to

Herbalife's operation; (2) evidence that Herbalife's distribution network was entangled with drug

traffickers, drug trafficking channels, and organized crime; and (3) that Herbalife might have

been targeting vulnerable groups to serve as distributors. *Id.* ¶¶ 27–29, 32.

---

[2] The relevant provision reads, in full:

> In the event the case developed by BERG Associates is settled or resolved in a
> manner that [Pershing] determines is beneficial to the financial standing of
> [Pershing], the hours billed previously by BERG will be paid at a rate of $750 per
> hour. The decision regarding the 'beneficial status' will be made by [Pershing]
> based on its evaluation of the work product delivered by BERG Associates.

Fee Agr. at 4.

On July 22, 2014, Pershing's principal, William Ackman, gave a public presentation titled "The Big Lie," with the goal of eroding public confidence in Herbalife and thereby benefitting Pershing's short position. *Id.* ¶¶ 30–33. BERG alleges that this presentation drew upon materials obtained from its investigation, including evidence that Herbalife had targeted vulnerable groups and was linked to Mexican, Russian, and Brazilian organized crime and money-laundering operations. *Id.* ¶¶ 30, 32. BERG alleges that, "[a]s a result of BERG's investigation as presented in the 'The Big Lie', Herbalife was the subject of a Federal Trade Commission (FTC) investigation . . . ." *Id.* ¶ 40. BERG also alleges that, as a result of Pershing's presentations—and, indirectly, BERG's work—Herbalife's stock price "plummeted" from $80.81 per share (when the Fee Agreement was finalized on December 23, 2013) to $33.25 per share on March 12, 2015 (when BERG alleges that its investigatory case "settled or resolved"). *Id.* ¶¶ 25, 34, 45–47.[3]

On March 12, 2015, Pershing told BERG to "stand down." *Id.* ¶ 34. As a result, BERG ceased its investigation into Herbalife. *Id.* However, Pershing also asked BERG to continue to be "available to consult if needed" and to "continue to respond to regulators with information," and used BERG's earlier research in presentations to the Drug Enforcement Agency ("DEA")

---

[3] In connection with its motion, Pershing introduces extrinsic evidence that Herbalife's stock price rose by 25% on the day of the July 2014 "The Big Lie" presentation. *See* Dkt. 55 ("Pershing Mem.") at 5, 14; *see* Coffey Decl., Ex. D. The Court may, and does, take judicial notice of the fact of the stock price rise. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) ("[T]he district court may take judicial notice of well-publicized stock prices" even where such data "were not attached to the Complaint as an exhibit or incorporated by reference into the Complaint"). The Court, however, may not credit on this motion Pershing's causal claim that the increased price disproves BERG's thesis that Pershing's use of BERG's work product was damaging to the stock price, and therefore helpful to Pershing. In any event, the Court has not relied on changes in Herbalife's stock price in resolving the pending motion.

and the Federal Trade Commission ("FTC"), the latter of which ultimately reached a settlement with Herbalife in 2016. *Id.* ¶ 40.

Around the same time, two BERG associates advised Pershing to close its short position on Herbalife. *Id.* ¶ 35. Pershing chose not to do so, in what BERG characterizes as "an imprudent investment decision." *Id.* ¶ 37.

On March 24, 2015, BERG sent Pershing a letter demanding the success fee, which it claimed totaled $3,086,875. *Id.* ¶¶ 50–51. On May 6, 2015, representatives for both Pershing and BERG, including Ackman, met in New York City. *Id.* ¶¶ 52–53. There, Ackman expressed surprise that BERG had been asked to "stand down." *Id.* ¶ 53. He stated that he would revisit BERG's entitlement to the success fee after he closed his position in Herbalife. *Id.* ¶ 54.

In or around July 2018, Pershing closed its position in Herbalife at a "significant loss." *Id.* ¶¶ 48, 55. On July 24, 2019, BERG renewed its demand for payment. *Id.* ¶ 56.

Pershing has not paid, and has refused to pay, BERG any part of the success fee. *Id.* ¶ 61.

### 4. BERG's Claims

BERG brings two claims against Pershing: for breach of contract and for breach of the implied covenant of good faith and fair dealing (the "implied covenant"). *Id.* ¶¶ 57–67.

As to the contract-breach claim, BERG alleges that if Pershing had closed its short position in Herbalife on March 12, 2015 (when BERG's representatives advised it to do so and when BERG was told to "stand down"), Pershing would have realized a $107,010,000 gain— which BERG alleges would unquestionably have been a "financial benefit." *Id.* ¶¶ 35–36. BERG also alleges that the use of information its investigation had uncovered contributed to the drop in Herbalife's stock price between December 23, 2013 and March 12, 2015, and therefore would have been responsible for that benefit. *Id.* ¶¶ 45–47. BERG claims that Pershing's failure to pay

BERG the success fee, after "having received services from BERG that were beneficial to the financial standing of Pershing," breached the parties' agreement. *Id.* ¶ 61; *see id.* ¶¶ 62–63.

Second, BERG alleges that, by refusing BERG's advice to close its short position in March 2015, when it stood to realize a significant gain, Pershing acted arbitrarily and unreasonably "to prevent BERG from enjoying the benefit of the [success fee]," in violation of the implied covenant. *Id.* ¶ 65.

### B. Procedural History

On December 10, 2019, BERG filed a complaint against Pershing in federal district court in the District of Massachusetts. Dkt. 3. Pershing moved to dismiss, based on lack of personal jurisdiction and failure to state a claim. Dkts. 16–18.

On December 1, 2020, the presiding court held that it lacked personal jurisdiction over Pershing, Dkt. 29, and, rather than dismiss, transferred the case to this District. Dkt. 30. On December 18, 2020, the Court held an initial conference, at which BERG stated that it intended to file an amended complaint. *See* Dkt. 31. As reflected in the order issued after the conference, the Court granted BERG leave to file such a complaint, while providing that no further amendments would be permitted. Dkt. 48 ("No further opportunities to amend will ordinarily be granted.").

On December 31, 2020, BERG filed the Amended Complaint. On January 15, 2021, Pershing filed a motion to dismiss, Dkt. 53, as well as a memorandum of law in support, Pershing Mem., and the declaration of John P. Coffey, Esq., with supporting exhibits. On February 12, 2021, BERG opposed that motion. Dkt. 56 ("BERG Mem."). On February 25, 2021, Pershing replied. Dkt. 58 ("Pershing Reply").

On June 23, 2021, the Court held argument. Dkt. 61.

## II. Legal Standards

### A. Rule 12(b)(6) Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### B. Relevant Principles of New York State Contract Law

The Fee Agreement is governed by New York law. *See* Pershing Mem. at 8 n.5; BERG Mem. at 7 n.4; *see also Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (parties' consent is "sufficient to establish the applicable choice of law" (citation omitted)). Under that law, the interpretation of an unambiguous contract is a question of law to be addressed by the Court. *See, e.g.*, *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 451 (1983). So, too, is the determination whether a contract provision is ambiguous. *See, e.g.*, *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004); *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). A contract is ambiguous only where "the provisions in controversy are reasonably or fairly susceptible of different interpretations or

may have two or more different meanings." *Goldman Sachs Grp., Inc. v. Almah LLC*, 85 A.D.3d 424, 426 (1st Dep't 2011) (citation omitted); *see also Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005). A contract is not ambiguous merely because the parties ask the Court to adopt different constructions of it. *See Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010).

In determining the meaning of a contract, the Court "look[s] to all corners of the document rather than view[ing] sentences or clauses in isolation." *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989) (citation omitted); *see Kass v. Kass*, 91 N.Y.2d 554, 566–67 (1998). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162. In other words, the Court's "primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Bolt Elec., Inc. v. City of New York*, 223 F.3d 146, 150 (2d Cir. 2000). Where the question of liability turns on applying the unambiguous language of a contract to undisputed facts, granting a motion to dismiss is appropriate. *See, e.g.*, *Am. Auto Ins. Co. v. Rest Assured Alarm Sys., Inc.*, 786 F. Supp. 2d 798, 803 (S.D.N.Y. 2011) ("Because contract interpretation is generally a question of law, it is suitable for disposition on a motion to dismiss." (citation omitted)).

## III. Discussion

Pershing argues that both BERG's breach of contract claim and implied covenant claim must be dismissed for failure to state a claim, because BERG's theories of breach, as measured against the terms of the parties' agreement, do not articulate a plausible basis for BERG's entitlement to a success fee. The Court addresses the two claims in turn.

## A.    Breach of Contract

In its breach of contract claim, the Amended Complaint alleges that BERG performed its obligations under the Fee Agreement, Am. Compl. ¶ 59, but that Pershing, despite having received services from BERG "that were beneficial to the financial standing of Pershing," refused to pay BERG the contractual success fee, *id*. ¶ 61, and thus breached, *id*. ¶ 62.

Pershing makes two arguments for dismissal of that claim.  *See* Pershing Mem. at 10–15.

First, it argues that the condition precedent that the Fee Agreement sets for payment of a success fee—that "the case developed by BERG" be "settled or resolved in a manner that [Pershing] determines is beneficial to [its] financial standing"—is not plausibly alleged to have occurred.  That is because, Pershing argues, the "case" to which the agreement refers necessarily refers to Pershing's Herbalife investment.  And this, Pershing notes, was not "settled or resolved" until 2018, when Pershing exited its short position—at a significant monetary loss. Thus, Pershing argues, the Amended Complaint does not plausibly allege that the "case" ever was "settled or resolved" in a manner beneficial to its financial standing.  *Id.* at 10–12.  Second, Pershing argues that, regardless of when the "case" at issue settled or resolved, for the success fee provision to have been breached, Pershing must have "determined" that the settlement or resolution of the case was "beneficial to [its] financial standing," yet declined to pay BERG a success fee.  However, Pershing notes, the Amended Complaint does not allege that Pershing ever made such a determination, or that it acted arbitrarily or irrationally in failing to make that determination. *Id.* at 12–15.

BERG counters Pershing's first argument by asserting that, under the Fee Agreement, "case" refers to BERG's investigative work, and that, as pled, this work "settled or resolved" in March 2015 when Pershing told BERG to "stand down."  BERG Mem. at 9.  And, BERG notes, according to its Amended Complaint, as of March 2015, Pershing's short position had an

unrealized gain of $107 million, such that, had Pershing then closed out that position, BERG's work, which had helped drive down Herbalife's stock price, would have proven beneficial to Pershing's financial standing. *Id.* at 10–11 (citing Am. Compl. ¶ 35). In the alternative, BERG argues that the critical terms used in the Fee Agreement—"case," and "settled or resolved"—are ambiguous, preventing the Court from granting Pershing's motion to dismiss. *Id.* at 9–10. BERG counters Pershing's second argument by asserting that a decision by Pershing not to treat its $107 million unrealized gain in March 2015 as financially beneficial could plausibly be termed arbitrary or unreasonable. *Id.* at 11–13.

In considering whether the Amended Complaint's theories of breach state a claim, the Court is guided by New York law, under which, to state a claim of contract breach, a plaintiff must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund*, 375 F.3d at 177 (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). Salient here, "[u]nder New York law, . . . a condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" *Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995)). Although New York courts generally require that conditions precedent be "expressed in unmistakable language," certain "linguistic conventions of condition"—including "in the event," as the parties here used—suffice. *Id.* (citation omitted). "[I]f the conditions precedent to a defendant's duty to perform have not been met, breach is not possible." *Deutsche Bank AG v. AMBAC Credit Prods., LLC*, No. 04 Civ. 5594 (DLC), 2006 WL 1867497, at *9 (S.D.N.Y. July 6, 2006).

Here, measuring the factual allegations in the Amended Complaint against the terms of the Fee Agreement and these principles of New York law, BERG has not plausibly alleged that Pershing breached the Fee Agreement by declining to pay it a success fee. The Court considers Pershing's arguments in the order presented.

Pershing's first argument is that the "settle[ment]" or "resol[ution]" of the "case developed by BERG" necessarily refers to the cessation of Pershing's investment in Herbalife, at which point, Pershing notes, it had experienced a loss, not a benefit, to its financial standing, from that investment. That theory, however, cannot secure dismissal on the pleadings. That is because these contract terms—which appear intended for investigative work arising in a different factual context—are awkward and, as BERG argues, ambiguous.

To be sure, as between Pershing's interpretation of this contractual text and BERG's, Pershing's appears far the more coherent. The operative language—"[i]n the event the case developed by BERG Associates is settled or resolved in a manner that [Pershing] determines is beneficial to [its] financial standing"—more plausibly fits Pershing's interpretation (that it refers to the culmination of Pershing's involvement with Herbalife) than BERG's (that it refers to the cessation of BERG's investigative work). That is because the Fee Agreement expressly refers to Pershing's position in Herbalife as the impetus for BERG's work, with the clear implication that the focus for Pershing in determining the entitlement to a success fee was the outcome of that position. *See* Fee Agr. at 4 ("BERG does not guarantee that the outcome of the investigative work will positively or negatively impact investments [Pershing] has made in [Herbalife]."). To the extent that BERG's work "developed" a "case" for Pershing's use, such use most naturally refers to a case to be used *with respect to* that Herbalife investment, and in support of Pershing's

short position. On the face of the agreement, BERG's "case" did not have intrinsic value to Pershing; it had value only as it impacted Pershing's Herbalife fortunes.

The contractual terms "settled or resolved" also do not easily fit BERG's thesis. Those terms do not naturally apply to the mere cessation of an investigator's research for a client. Indeed, in the common context in which an investigative firm is retained to assist in litigation or an arbitration—and the clause in question may be vestigial language from a matter involving such "controversy" work—the terms "settled or resolved" would naturally refer to the cessation of the client's dispute with its adversary, not the cessation of its investigator's discrete workstream. As Pershing fairly notes, dictionary definitions of these terms suggest a finality that accords with its, not BERG's, reading. *See* Pershing Reply at 3–4.[4] Put differently, although BERG's work itself might have *ended*, or diminished, when Pershing asked it to "stand down," it would stretch the ordinary meaning of these words to say that the "case" BERG had "developed" had "settled or resolved" at that moment in time.[5]

---

[4] *See, e.g.*, *settle*, v., Oxford Eng. Dictionary, https://www.oed.com/view/Entry/176867?is Advanced=false&result=1&rskey=cRIAUr& (uses of "settle" include "[t]o come to an end of a series of changes . . . and assume a definite form or condition," "to become fixed," and "to render or become stable or permanent"); *settle*, Merriam-Webster, https://www.merriam -webster.com/dictionary/settle (uses of "settle" include "to come to rest" and "to become fixed, resolved, or established"); *settle*, Am. Heritage Dictionary, https://www.ahdictionary.com /word/search.html?q=settle (uses of "settle" include "[t]o discontinue moving and come to rest in one place"); *resolve*, Merriam-Webster, https://www.merriam-webster.com/dictionary/resolve ("to deal with successfully: clear up").

[5] Although not germane to the issue of contract meaning presented by the instant motion to dismiss, BERG's factual allegation that it continued to be available to perform services for Pershing after Pershing allegedly told it to "stand down" complicates its notion that the end of its work activities presents a mutually discernible end point by which to measure the "settlement" or "resolution" of its "case." *See* Am. Compl. ¶ 40.

Construing this provision as BERG urges also creates tension between the two operative terms—"case" and "settled or resolved"—which BERG argues together require that Pershing's assessment of the benefit to its "financial standing" occur when the case developed by BERG is "settled or resolved." *See* Fee Agr. at 4; *see also In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171 (1st Dep't 2003) (courts should avoid contract interpretations that are "commercially unreasonable"). And tying that assessment to the cessation of Pershing's Herbalife investment yields a commercially practicable result. At the point at which Pershing closed out its position in Herbalife, determining whether Pershing had financially benefitted from the investment, and, by extension, from BERG's work on the case would, in all likelihood, present a manageable assignment. In contrast, tying that assessment to the point at which BERG had ceased its investigative work would make for a more elusive and potentially nebulous project. The parties would be obliged to assess such financial benefit at the midstream of Pershing's investment, at a point when its "financial standing"—vis-à-vis Herbalife, and as influenced by BERG's efforts— might well be in substantial flux (as proved the case here). The parties' shared commercial interest in a readily determinable outcome is consistent with Pershing's construction, but not BERG's, as to the point of "settle[ment]" or "resol[ution]."

That said, the Fee Agreement is far from a model of draftsmanship. As the Court observed at argument, the agreement's reference to a "case" that could be "settled or resolved" "looks like leftover language from a litigation-based assignment, . . . a real mismatch for the type of work that's being done here." Arg. Tr. at 9. Although the term "case" may more plausibly refer to a client's holistic project, like Pershing's Herbalife investment strategy, than to the

discrete work of a retained investigative firm, like BERG,[6] its meaning in the context of attempts

by a short seller like Pershing to move market prices to its advantage—in which words like

"case," "settle," and "resolve" have less obvious traction than in litigation—is far from self-

evident. And BERG's textual arguments, although shaky, are not *per se* unreasonable. *See, e.g.*,

*Law Debenture Tr. Co.*, 595 F.3d at 466 (contract term ambiguous where language "could

suggest more than one meaning when viewed objectively by a reasonably intelligent person who

has examined the context of the entire integrated agreement and who is cognizant of the customs,

practices, usages and terminology as generally understood in the particular trade or business"

(citation omitted)); *Goldman Sachs Grp.*, 85 A.D.3d at 426 (contract term ambiguous where "the

provisions in controversy are reasonably or fairly susceptible of different interpretations or may

have two or more different meanings" (citation omitted)). For example, the Fee Agreement's

provision that Pershing would make its assessment of any financial benefit "based on its

evaluation of the work product delivered by BERG," if viewed in isolation, can be argued to

make BERG's work, not the success of Pershing's Herbalife strategy more broadly, the relevant

frame of reference. Fee Agr. at 4.[7]

On a Rule 12(b)(6) motion, the Court must draw all reasonable inferences and resolve all

ambiguities in the non-movant's favor. That standard is decisive here. *See, e.g.*, *Koch*, 699 F.3d

---

[6] Had BERG's work been undertaken in connection with—and led to the filing of—a legal action, the contract term here would clearly refer to the settlement or resolution of that "case" at the conclusion of that legal action, via settlement or judgment, and not merely when BERG's investigatory assignment ceased.

[7] Although this provision did not purport to be exclusive—*i.e.*, it did not forbid Pershing from considering factors other than the quality of BERG's "work product" in deciding whether the case had settled or resolved "in a manner . . . beneficial to [Pershing's] financial standing"—it did not identify any specific other consideration which Pershing might consider. Fee Agr. at 4.

at 145.  Although Pershing's construction might well prevail at a stage of litigation that

empowered a more fulsome assessment, the Court cannot agree with Pershing that "case," as

used in the Fee Agreement, unambiguously must refer to the Herbalife matter writ large, and that

"settled or resolved" must refer only to the termination of that entire investment.  Rather, given

these problematic terms and the context at hand, the Court finds the success fee provision of the

agreement ambiguous on this point, and therefore cannot grant Pershing's motion to dismiss on

this basis.  *See, e.g.*, *Chambers v. HSBC Bank USA, N.A.*, No. 19 Civ. 10436 (ER), 2020 WL

7261155, at *3 (S.D.N.Y. Dec. 10, 2020) ("If a material contractual term is ambiguous, . . .

dismissal is inappropriate because all contractual ambiguities must be resolved in favor of the

plaintiff at this stage."); *Readick v. Avis Budget Grp., Inc.*, No. 12 Civ. 3988 (PGG), 2013 WL

3388225, at *4 (S.D.N.Y. July 3, 2013) ("A motion to dismiss can be granted only where the

language of a contract is clear and unambiguous."); *Vectron Int'l, Inc. v. Corning Oak Holding,*

*Inc.*, 106 A.D.3d 1164, 1165 (3d Dep't 2013) ("In the context of a motion to dismiss, if the

contract's language is ambiguous, then the motion must be denied to permit the parties to

discover and present extrinsic evidence of the parties' intent.").[8]

---

[8] Pershing relies on the *contra proferentem* canon of construction to argue that, even if the Court
were to find the relevant contract terms ambiguous, dismissal of BERG's breach of contract claim
is required.  That principle of New York law requires that ambiguous contract terms be construed
against the drafter.  *See, e.g.*, Pershing Mem. at 11 n.7 (collecting cases).  However, "[i]t is
familiar law that courts should not resort to *contra [proferentem]* until after consideration of
extrinsic evidence to determine the parties' intent."  *M. Fortunoff of Westbury Corp. v. Peerless
Ins. Co.*, 432 F.3d 127, 142 (2d Cir. 2005) (citation omitted); *see Int'l Multifoods Corp. v. Com.
Union Ins. Co.*, 309 F.3d 76, 88 n.7 (2d Cir. 2002) ("[W]e have made clear that under New York
law, courts should not resort to *[contra proferentem]* until after consideration of extrinsic
evidence." (collecting cases)).  Because, at the motion to dismiss stage, the Court cannot
consider extrinsic evidence beyond that contained or incorporated in, or integral to, the Amended
Complaint, *see, e.g.*, *DiFolco*, 622 F.3d at 111, it must defer any application of the *contra
proferentem* canon until after it has considered whether extrinsic evidence could resolve the
contractual ambiguity.  This canon thus cannot resolve the parties' dispute today.

However, even resolving this ambiguity in BERG's favor and assuming that the term "settled or resolved" could refer either to March 2015, when the bulk of BERG's work terminated, or 2018, when Pershing closed its position in Herbalife and suffered a substantial loss, BERG's Amended Complaint fails to plausibly allege a breach of contract by Pershing—for the second and independent reason Pershing offers. Specifically, regardless of the point at which BERG's "case" "settled or resolved," the Fee Agreement gave *Pershing* discretion to determine whether such event was "beneficial to [its] financial standing." Fee Agr. at 4. And, critically, BERG does not allege that Pershing *ever* made such a determination. It instead alleges only that Pershing had *received* a financial benefit as of March 2015, when Herbalife's stock price had fallen so as to make Pershing's unrealized gain from its open short position $107 million. *See, e.g.*, Am. Compl. ¶¶ 35, 60–62; *see also* BERG Mem. at 4–5.[9] Far from alleging that Pershing had found this unrealized gain to "benefi[t] . . . [its] financial standing," BERG instead alleges that, when BERG asked Pershing's Ackman in May 2015 to pay the success fee, he expressly deferred any such determination "until he closed his position" in Herbalife. Am. Compl. ¶ 54. Given that (1) the Fee Agreement provides that BERG was owed the success fee only "[i]n the event" that Pershing made such a determination; (2) the Amended Complaint does not allege that Pershing ever did so; and (3) it is quite plausible that Pershing would not have done so, as there would not have been an obvious reason for Pershing to make such a determination at a point when its gains were on paper only and at which it had not elected to exit its position to lock in

---

[9] And even that claim, of an actual financial benefit, is murky: elsewhere in the Amended Complaint, BERG puts the point differently: Pershing, it states, "*would have realized*" a financial benefit had it followed BERG's advice to close out its short position in March 2015. *E.g.*, Am. Compl. ¶¶ 36, 47.

those gains (or losses), the Amended Complaint does not plausibly allege that Pershing breached the Fee Agreement by failing to pay BERG the success fee.[10]

Nor has BERG plausibly alleged that Pershing acted unreasonably or arbitrarily in failing to determine in March 2015 that BERG's case had settled or resolved in a manner "beneficial to [its] financial standing." That is because, even assuming that BERG's "case" had "settled or resolved" at that time, Pershing—notwithstanding its $107 million paper gain—would have acted well within its discretion, and not arbitrarily, in determining that it had not experienced a benefit to its financial standing at that time and deferring any further such determination until it had closed its position in Herbalife.[11]

"Where the contract contemplates the exercise of discretion"—as the vesting of the determination of any financial benefit with Pershing does here—"this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995); *see Schweizer v. Sikorsky Aircraft Corp.*, 634 F. App'x 827, 830 (2d Cir. 2015) (summary order) (courts "will not interfere with [a] discretionary determination

---

[10] BERG's brief in opposition imagines scenarios in which an entity in Pershing's shoes might have had occasion in March 2015 to make such a determination. It posits, for example, that Pershing might have used the unrealized value of its short position on Herbalife to attract new investors or to raise new funds from existing investors. *See* BERG Mem. at 12. In resolving the motion to dismiss, the Court disregards these speculative assertions, which first appear in BERG's legal brief. *See, e.g.*, *Cruz v. City of New York*, No. 15 Civ. 2265 (PAE), 2016 WL 234853, at *6 (S.D.N.Y. Jan. 19, 2016) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." (collecting cases)).

[11] Although the Fee Agreement can plausibly be read to set the "settle[ment]" or "resol[ution]" of the relevant "case" at the conclusion of BERG's work, it does not contain language setting the time at which Pershing must determine whether it received a financial benefit. *See* Fee Agr. at 4.

unless it is performed arbitrarily or irrationally" (quoting *Dalton*, 87 N.Y.2d at 392)).[12]  This

obligation, however, cannot "undermine a party's general right to act on its own interests in a

way that may incidentally lessen the other party's expected benefit." *Sec. Plans, Inc. v. CUNA*

*Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014) (citation omitted).  Nor can it "be construed so

broadly as effectively to nullify other express terms of a contract, or to create independent

contractual rights." *Nasdaq, Inc. v. Exch. Traded Managers Grp., LLC*, 431 F. Supp. 3d 176, 252

(S.D.N.Y. 2019) (quoting *Peter R. Friedman, Ltd. v. Tishman Speyer Hudson Ltd. P'ship*, 107

A.D.3d 569, 570 (1st Dep't 2013)).

    Here, BERG's claim that Pershing acted arbitrarily or irrationally in failing to decide in

March 2015 that BERG was entitled to the success fee fails for multiple reasons.  First, it was

belatedly made.  The Amended Complaint does not allege that it was unreasonable or arbitrary

for Pershing not to deem "beneficial to [Pershing's] financial standing" its unrealized gain in its

Herbalife position as of March 2015.  Instead, it alleges that Pershing's decision to not close its

short position and lock in its gain in March 2015, when BERG's representatives allegedly so

advised, was arbitrary or unreasonable. *Id.* ¶¶ 35, 43, 47, 65.[13]  The former claim, regarding

Pershing's assessment of its financial standing, was first articulated in BERG's opposition brief.

*See* BERG Mem. at 11–13.  It therefore fails, as "it is axiomatic that the Complaint cannot be

---

[12] Both parties discuss this obligation in connection with BERG's breach-of-contract claim.  In
fact, the case law generally treats the obligation not to act arbitrarily or irrationally in exercising
contractual discretion as an aspect of the implied covenant of good faith.  *See, e.g.*, *Dalton*,
87 N.Y.2d at 389 (discussing "covenant of good faith and fair dealing in the course of contract
performance").  Regardless, given the parties' approach, and the fact that "[i]n New York, breach
of the implied duty of good faith and fair dealing is merely a breach of the underlying contract,"
*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (citation omitted),
the Court addresses this here, in connection with BERG's breach of contract claim.

[13] That claim fails for the reasons discussed in connection with BERG's claim of a breach of the
implied duty of good faith and fair dealing.  *See infra* pp. 20–23.

amended by the briefs in opposition to a motion to dismiss." *Cruz*, 2016 WL 234853, at *6 (collecting cases).

Moreover, even drawing all plausible inferences in BERG's favor, the factual allegations in the Amended Complaint do not support the notion that Pershing acted unreasonably in not treating its unrealized gain as "beneficial to [its] financial standing" so to qualify BERG for a success fee. To be sure, as BERG notes, the parties' contract did not *require* Pershing to assess its financial standing based only on realized gains. *See* BERG Mem. at 11; Fee Agr. at 4. It was instead silent as to any limitation on the metrics that Pershing could utilize. But BERG's argument flips the relevant framework: To survive a motion to dismiss, BERG must have plausibly alleged not only that the contract *authorized* Pershing to have made a different determination, but that, under the terms of the contract, Pershing acted "arbitrarily and irrationally" in exercising the discretion that the Fee Agreement granted Pershing to determine whether it had experienced a financial benefit. *See, e.g.*, *Dalton*, 87 N.Y.2d at 389.

BERG has not come close to doing so. It has not, for instance, identified any aspect of the parties' agreement—explicit or implied—that required Pershing to use unrealized gains as the metric by which it assessed its own financial standing, or rendered it unreasonable not to do so.[14] The Fee Agreement vests Pershing with the discretion to determine whether BERG developed a "case" that had been "settled or resolved" in a manner beneficial to Pershing's

---

[14] In its filings and at argument, BERG has speculated that, because Pershing is a hedge fund, it *likely* considered the value of its portfolio in assessing its financial standing. *See* Am. Compl. ¶ 41 (alleging that Pershing "presumably" would have judged its financial standing, *inter alia*, "by the effect on the existing stock positions held by the funds managed by Pershing"); BERG Mem. at 12 ("[I]t is likely [Pershing] was using the unrealized value of its short position on Herbalife to woo new investors and to raise additional funds from existing investors."); Arg. Tr. at 23–24, 30–31. But these are merely speculative assumptions about how Pershing *might have* evaluated its financial position. They do not support that Pershing acted unreasonably or arbitrarily in charting a different path keyed, for example, to the gains (or losses) it realized.

19

"financial standing." Fee Agr. at 4. It does not set out express parameters as to what might constitute a financial benefit to Pershing. Its only guidepost as to Pershing's decision-making is that Pershing "will" make its determination, at least in part, "based on its evaluation of the work product delivered by BERG." *Id.* It does not, however, state that Pershing was obliged to consider unrealized, speculative, or otherwise evanescent gains when determining whether BERG's work product was financially beneficial. Absent such provisions, the Fee Agreement makes Pershing the judge of whether it received a financial benefit from BERG, constrained only by the general obligation not to act arbitrarily or irrationally. And BERG has not offered any theory on which Pershing breached that obligation by, apparently, waiting to consider the final disposition of its Herbalife investment before making that judgment.

At most, BERG alleges that in 2015, when the value of its short position exceeded by $107 million what Pershing had paid for it, Pershing did not conclude that it had received a benefit to its financial standing, choosing instead to assess its financial benefit (or lack thereof) after it had disposed of its Herbalife investment. *See, e.g.*, Am. Compl. ¶ 54. BERG's Amended Complaint does not plead a plausible basis on which to conclude that Pershing, at that point, had determined that it had received a financial benefit, or that its failure to do so was arbitrary or irrational. Accordingly, the Court grants Pershing's motion to dismiss BERG's claim for breach of contract.

### B.    Breach of the Implied Covenant

Pershing argues that BERG's implied covenant claim merely duplicates its breach of contract claim or, alternatively, that it fails to state a plausible claim for relief. *See* Pershing Mem. at 15; Pershing Reply at 8–10. BERG responds that its implied covenant claim is separate and distinct from its breach of contract claim, and, as properly construed, plausibly states a claim. *See* BERG Mem. at 13–14.

Under New York law, a duty of good faith and fair dealing is implied in every contract, to the effect that neither party "shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (citation omitted). The implied covenant does not include any term inconsistent with the terms of the contractual relationship, or "create duties which are not fairly inferable from the express terms of that contract." *Interallianz Bank AG v. Nycal Corp.*, No. 93 Civ. 5024 (RPP), 1994 WL 177745, at *8 (S.D.N.Y. May 6, 1994). Nor can it "be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Nasdaq, Inc.*, 431 F. Supp. 3d at 252 (quoting *Peter R. Friedman*, 107 A.D.3d at 570). But it does include promises that a "reasonable person in the position of the promisee would be justified in understanding were included" in the contract and, when the contract involves the exercise of discretion, a promise "not to act arbitrarily or irrationally in exercising that discretion." *Dalton*, 87 N.Y.2d at 389 (citation omitted). "[S]ince there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (quoting 23 Williston on Contracts § 63:22 (4th ed. 2006)).

As formulated in the Amended Complaint, BERG's implied-covenant claim is that Pershing acted arbitrarily or unreasonably when, in March 2015, Pershing "refus[ed] to follow [BERG's] recommendation to close its positions" in Herbalife. Am. Compl. ¶ 65. Although not duplicative of BERG's claim of breach of contract,[15] this fails to state a claim. It incorrectly

---

[15] At argument, Pershing conceded that its argument that BERG's implied-covenant claim is duplicative was misplaced. Arg. Tr. at 16–17.

presupposes that the Fee Agreement obliged Pershing to heed BERG's investment advice. It did not. The Fee Agreement instead is completely silent on Pershing's obligations with respect to its investment decisions. It sets out duties for BERG of a wholly different character—to report on facts and suspicions about Herbalife, including to "identify and expose [Herbalife] activities and operations that create corporate and legal risk." Fee Agr. at 3. It is devoid of any term that gave BERG, an investigative firm, any role in furnishing investment advice to Pershing. *See Nasdaq, Inc.*, 431 F. Supp. 3d at 252 (implied covenant does not "create independent contractual rights"); *Interallianz Bank*, 1994 WL 177745, at *8 (implied covenant does not "create duties which are not fairly inferable from the express terms of that contract").

Indeed, when pressed at argument, BERG's counsel all but disavowed this claim, repeatedly disclaiming that its implied-covenant claim rested on the allegation that Pershing failed to heed BERG's investment advice. *See* Arg. Tr. at 22–23, 28–29. And the Amended Complaint's only factual allegation on this point—that Pershing's decision not to close out its position in March 2015 was meant "to prevent BERG from enjoying the benefit of the Hourly Fee Increase," Am. Compl. ¶ 65[16]—is a classic "mere conclusory statement[]," and thus not entitled to any weight, *Iqbal*, 556 U.S. at 663. In any event, that allegation is implausible given the context of Pershing's decision not to close its position in 2015: It assumes that Pershing, a sophisticated hedge fund presumably interested in profit maximization, chose to forgo a $107 million gain that it otherwise stood to pocket solely to deny BERG a $3 million success fee. The Amended Complaint does not offer any factual basis why Pershing would do that.

---

[16] In its opposition brief, BERG stakes a bolder claim by arguing that Pershing "pushed [its] positions in Herbalife beyond all reasonable constraints in a reckless manner" so as "to deprive BERG of the benefit of its bargain." BERG Mem. at 15. For purposes of this motion, this allegation can be disregarded, as it is conclusory and absent from the Amended Complaint.

Although—with the benefit of hindsight—Pershing's decision not to close its position in March 2015 may have been "imprudent," as BERG alleges, BERG has not pled facts suggesting that the decision was, at all, in bad faith or arbitrary, as opposed to being undertaken in Pershing's own perceived self-interest. Am. Compl. ¶ 37; *see Sec. Plans, Inc.*, 769 F.3d at 817 ("The implied covenant does not undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit." (citation omitted)). Even assuming that Pershing acted ill-advisedly in failing to close out its Herbalife position when BERG allegedly recommended that it do so, a party bringing a claim for breach of the implied covenant "must show substantially more than evidence that the defendant's actions were negligent or inept." *Sec. Plans, Inc..*, 769 F.3d at 817. BERG has not plausibly alleged any more than a mistaken business decision, much less bad faith. Accordingly, the Court also dismisses its claim for breach of the implied covenant.

### C. Dismissal with Prejudice

The Court today dismisses BERG's second effort at pleading claims against Pershing. In filing its Amended Complaint, BERG had the benefit of reviewing the motion to dismiss Pershing filed in response to BERG's initial complaint, which made approximately the same arguments that today have proven fatal to its claims. Dkt. 17 at 14–19. After the case was transferred to this District, the Court gave BERG the opportunity to amend its complaint, and informed it that "[n]o further opportunities to amend will ordinarily be granted." Dkt. 48. BERG elected to amend its complaint, but failed to plead any plausible claims against Pershing. And BERG has stated that it is unaware of any additional unpled, extrinsic evidence that could salvage its claims, Arg. Tr. at 20–21; nor has it sought leave to file a further amended complaint. The Court's dismissal of BERG's claims for damages is therefore with prejudice and without

leave to amend. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 506 (2d Cir. 2014) (upholding dismissal of amended complaint with prejudice where, "following Defendant's first motion to dismiss for failure to state a claim," plaintiff had amended its complaint once and failed to "resolve its pleading deficiencies in its First Amended Complaint"); *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, 351 F. App'x 472, 474 (2d Cir. 2009) (summary order) (district court did not abuse discretion by dismissing with prejudice where plaintiff "did not move for leave to replead in opposition to [defendant's] motion to dismiss his original complaint with prejudice").

## CONCLUSION

For the foregoing reasons, the Court grants Pershing's motion to dismiss BERG's Amended Complaint, in its entirety and with prejudice.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 53 and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: July 16, 2021
New York, New York