L6N1BUSA

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    BUSINESS EXPOSURE REDUCTION
     GROUP (BERG) ASSOCIATES,
4
                    Plaintiff,
5
               v.                          20 Civ. 10053 (PAE)
6
     PERSHING SQUARE CAPITAL
7    MANAGEMENT, L.P.,

8                   Defendant.             Remote Oral Argument
     ------------------------------x
9                                          June 23, 2021
                                           3:34 p.m.
10
     Before:
11
                         HON. PAUL A. ENGELMAYER,
12
                                           District Judge
13
                             APPEARANCES
14
     COMPASS LAW PARTNERS
15        Attorneys for Plaintiff
     BY:  BRIAN R. DELLA ROCCA, ESQ.
16
     POWHIDA & CANO, PLLC
17        Attorneys for Plaintiff
     BY:  ALEXANDER POWHIDA, ESQ.
18
     KRAMER LEVIN NAFTALIS & FRANKEL, LLP
19        Attorneys for Defendant
     BY:  JOHN P. COFFEY, ESQ.
20        JASON M. MOFF, ESQ.

21   ALSO PRESENT:  DANIELLE MOODY, ESQ.
                    Kramer Levin Naftalis & Frankel, LLP
22
     ALSO PRESENT:  DAVID KLAFTER
23                  Pershing Square Capital Management

24

25

L6N1BUSA

```
1              (Case called)
2              THE COURT:  Who do I have for the plaintiff, which
3    I'll refer to as BERG?
4              MR. DELLA ROCCA:  Good afternoon, your Honor.  This is
5    Brian Della Rocca, and we've also got Alex Powhida on the line.
6              THE COURT:  Very good.  Mr. Della Rocca, will you be
7    taking the lead today?
8              MR. DELLA ROCCA:  Yes, your Honor.
9              THE COURT:  All right.  Good afternoon.
10             Who do I have for the defendant Pershing?
11             MR. COFFEY:  Good afternoon, your Honor.  It's Sean
12   Coffey of Kramer Levin for Pershing Square Capital Management.
13   I note that I have on the call, but not speaking, my colleague
14   Jason Moff, and a representative of the client David Klafter
15   from Pershing Square, and in an observing capacity, a young
16   associate at Kramer Levin who was invited to hear how you
17   conduct hearings, the highly capable yet still relatively young
18   Danielle Moody.  Good afternoon, your Honor.
19             THE COURT:  All right.  Good afternoon, Mr. Coffey,
20   Mr. Moff, Mr. Klafter, and is it Ms. Moody?
21             MR. COFFEY:  It is.  I'll answer for her.
22             THE COURT:  Okay.  Well, good afternoon to all of you.
23   And Mr. Coffey, I take it you'll be taking the lead for the
24   defense?
25             MR. COFFEY:  That's correct, your Honor.
```

L6N1BUSA

1          THE COURT:  All right.  Very good.  Thank you.

2          And is our court reporter on the line?

3          THE REPORTER:  Yes, your Honor.  Good afternoon.  It's

4     Khris Sellin.  How are you.

5          THE COURT:  Fine.  How are you.  Thank you, as always,

6     for your service.

7          Okay.  We're here for oral argument on the motion to

8     dismiss filed by Pershing.

9          Mr. Coffey, the floor is yours.

10          MR. COFFEY:  Thank you, your Honor.  I am, of course,

11     quite confident that you've read and digested the papers, so

12     I'll be brief.  This is a case between a vendor and a client.

13     It's a case where the vendor, pursuant to the contracts, has

14     been paid over $1.1 million for its work, and at issue is

15     whether it is entitled to a success fee of approximately

16     $3 million in a case where its client lost several billion

17     dollars.

18          There are two independent reasons why the complaint

19     should be dismissed, with prejudice.  The first is that there

20     is condition precedent to a success fee that was never

21     satisfied.  And the language of the contract is unambiguous.

22     It states that in the event the case is settled or resolved in

23     a manner that Pershing Square determines is beneficial to its

24     financial standing, then Pershing can assess whether or not to

25     award a success fee.  An important component of that language

L6N1BUSA

1    is the temporal component and the words specifically "settled

2    or resolved."  And as we say in our papers, it's a quite

3    commonsense term, which is, when it's over, when it's closed or

4    settled, not a midpoint, midstream time of the plaintiff's

5    choosing, but when the case is settled or resolved.  And in

6    this motion, both parties agree that the case is defined as

7    BERG's assignment, its file, as it were, and that case was not

8    closed or settled until Herbalife the investment was liquidated

9    in July of 2018.  And when the case was closed or settled,

10    there was no financial benefit.  It was quite the opposite.

11    And there was no success and, therefore, no success fee.

12         So we think, looking at the plain language of the

13    agreement, which also dovetails with just common sense, if

14    you're retained to help in an investment, the success will be

15    judged on how successful the investment was, and it was,

16    frankly, an unhappy result for the client here.

17         The other basis is the fact that the parties agreed

18    that Pershing Square would have discretion as to whether to

19    award a success fee or not.  So even if there had been a

20    trigger here, which there was not, the question is: was

21    Pershing Square's exercise of discretion not to award a fee

22    arbitrary and irrational, unreasonable.  We agree that there is

23    implied in language where one party gets discretion that it

24    can't be abused, but that it can't be arbitrary, it can't be

25    wielded in an arbitrary or unreasonable manner.  It's very

L6N1BUSA

1    clear in this complaint there's no allegation whatsoever

2    regarding the decision not to award the bonus.  The complaint

3    is absolutely silent on that, and therefore it fails as a

4    matter of pleading on that.

5            To the extent that they address the issue of whether

6    Pershing Square would award a success fee, there's reference in

7    paragraphs 52 and 54 to a meeting in March of 2015 where

8    Pershing Square principal Bill Ackman quite reasonably said, in

9    a manner consistent with the commonsense interpretation of the

10   unambiguous language, yeah, we'll figure out whether to get a

11   bonus or not when we close out the agreement.  And so we think

12   that provides a separate, independent basis to dismiss the

13   complaint.  There's no allegation that the decision not to

14   award the bonus was arbitrary or unreasonable.

15           THE COURT:  Mr. Coffey, let me interrupt you for a

16   moment just to throw out a few scenarios, just to make sure I

17   understand what you're saying and what you're not saying.

18           Assume, contrary to the facts, that at the time that

19   BERG was asked to stand down, Pershing had sold its position

20   and therefore, because it had taken a short position and the

21   stock was depressed, made a lot of money, much more than the

22   value of the success fee.  Had that happened and had Pershing

23   at that point said, no success fee for you, where Pershing had

24   managed to realize a gain by virtue of the loss on its short

25   position, would Pershing then have realistically been obliged

L6N1BUSA

1    to pay the success fee?

2            MR. COFFEY:  No.  And your Honor, I'll just touch

3    first on my way to second here.  If that were the scenario,

4    then arguably that is when the case was closed or settled,

5    because they would have cashed out, consistent with our view of

6    the language.  So the issue, your Honor is focusing on is the

7    discretion, and there would still be a failure of pleading here

8    because --

9            THE COURT:  Sorry.  It's not a failure of pleading

10   because I'm giving you a hypothetical that didn't happen.  I'm

11   just trying to understand.  Just indulge the hypothetical

12   rather than focusing on the pleading, because my hypo

13   completely changes the facts.

14           MR. COFFEY:  Very good.

15           THE COURT:  Assuming, though, that you had sold at the

16   time and made money, unlike the way events played out, would

17   there have been, based on at least the information known, any

18   reason not to give the success fee, assuming that there was

19   reason to think that BERG's intel about Herbalife had resulted

20   in the stock drop or the decision to sell?

21           MR. COFFEY:  Well, your Honor, the last piece that you

22   added changes the answer I was going to give, because in fact

23   the decision regarding the beneficial status would be based on

24   its evaluation of the BERG work product, and I believe your

25   Honor just put into the hypothetical that the assessment by

L6N1BUSA

Pershing Square was that their work product was positive.  I
will concede that's a much closer call, and --

THE COURT:  Mr. Coffey, I take it what you're saying
is it can't be answered, because one would still need to make a
subjective assessment as to the quality of the work, and
hypothetically, their work, you're positing, might have been
unhelpful.  I think BERG is pleading that they actually came up
with some useful damaging intel on Herbalife, and on the
pleadings, I suppose I have to take that as correct.

MR. COFFEY:  Well, let me just push back on that
slightly, your Honor.  It is rather conclusory that they say
that, and maybe if they left that at that, we might have a
debate, but they go further and they go into detail about how
specifically they claim their information helped.  And recall,
this is a situation where the client has shorted Herbalife and
therefore a rising stock price is not helpful, and in the one
scenario they chose to go into some detail on, the big lie
presentation, having gone there, it backfires, because in fact,
the information that they acquired, where they say it was
helpful to this cause, when it was revealed publicly, the stock
price went up.

So I guess I have two points.  One is, it's not enough
to say simply, you know, we were retained when the stock was
high and when you told us to stop our day-to-day investigative
work, the stock was lowered; therefore, you know, we helped.  I

L6N1BUSA

mean, that kind of conclusory statement I don't think holds up

on its own.  But when they go further and say, and for

example -- and the only example they give is one that was

counterproductive to the client's goal, I don't think that

holds water.

THE COURT:  The counterproductive is hard for you on

the pleading standard, right, because in effect the most that's

going to be cognizable here that's outside the complaint is

going to be the stock price movement, but the issue of what

caused the stock to move up or down on a given day is

presumably capable of a multifactorial answer and probably

requires expertise, if it can be answered at all.  And so I

take your point that the stock price movement isn't *res ipsa*,

if you will, here, but I think I don't know that I could, on

the pleadings, possibly go beyond that.

MR. COFFEY:  Well, your Honor, I agree that -- as the

defendant here, I certainly don't want to invite you to assume

there's a question of fact.  I mean, it's not.  And I don't

think you need to go there.  I don't think we need to do that.

My point is simply, where the plaintiff alleges conclusorily

that something it did helped, and the one example it uses is on

its face based on, you know, its implication of what happened

that day -- and what happened that day, I think your Honor can

take judicial notice of that -- on that one day, it points the

other way, that that is something to consider.  But I do think

L6N1BUSA

I need to reset the focus from July 2014 and from March 2015,

to the date that the contract language itself says is at issue

here, and that's when the case is settled or resolved, and --

THE COURT:  Can I just pause.  That's exactly where I

was going to go next, though.  May I ask you:  You've

represented now that both parties agree that this somewhat

unusual formulation about the case being settled or resolved

clearly refers to the end of the work by BERG, and I have to

tell you that reading the plain language of the agreement, I

found it not quite so plain.  It's not obvious to me why it

should matter to you, because you have a separate argument

about why there's no success at the back end because your

client's in the red, but as a matter of just linguistic

contract interpretation, the language, "the case developed by

BERG Associates is settled or resolved," I think can be read

multiple ways in terms of what is getting settled or resolved.

I mean, I understand "the case developed by BERG" may focus on

BERG's work.  On the other hand, there isn't a case here.  This

looks like leftover language from a litigation-based

assignment, and "settled or resolved" is -- the settled part

especially -- a real mismatch for the type of work that's being

done here, and, you know, I can imagine a scenario in which you

would be wanting to say, actually, this thing wasn't settled or

resolved until my client made a decision what to do with its

investment.  That outcome, ironically, puts you in a better

L6N1BUSA

1    financial position because at that point, your client has

2    undisputedly lost money.  But why is it that just as a matter

3    of textual reading, "the case developed by BERG Associates is

4    settled or resolved," the clock on that needs to stop when BERG

5    is told to stand down?

6         MR. COFFEY:  Well, your Honor, I embrace the

7    interpretation you just laid out there, and if I'm unclear in

8    how I've said it, I apologize.  To me, it's the investment.

9    And the --

10        THE COURT:  Sorry.  In your brief you said something

11   like, "It's the investment."  A moment ago on the phone you

12   said to me that both parties are in agreement that, you know,

13   the time that midnight strikes, or the game of musical chair

14   ends -- choose your metaphor -- is when BERG earlier is told to

15   stop work.  So I'm trying to understand which you believe the

16   contract points to, if either, clearly.

17        MR. COFFEY:  Okay.  Well, my apologies for clouding up

18   what I thought we made clear in our brief and which I muddled.

19   The focus is on when they liquidated, when they closed out

20   their investment.  I mean, that's the matter we're talking

21   about.  That is the case we are talking about.  They are

22   working on the case.  They've opened a file on the case.

23   Whether they were told -- well, according to the pleading, they

24   were told to stand down in March of 2015, yet they were also

25   told to continue work and be available for consultation and

L6N1BUSA

1    deal with the regulators, and they don't allege in there that

2    they closed their file at that point.  Presumably they

3    continued to bill Pershing Square, although that's not

4    addressed in the complaint.  But what's not addressed is, they

5    don't say they closed their file.  And consistent with the

6    intent, in our view, the plain language of the term, one would

7    assess whether there was a success in this investment, a

8    success for the team, a success, including for BERG, when the

9    investment was liquidated.  And how did that look at the time?

10   So, you know, temporally, yes, it's very much when the case,

11   when the investment, was liquidated.

12           THE COURT:  But Mr. Coffey, let me pause you.  I

13   appreciate why you, perhaps guided by my comment, are centering

14   me now on the later date, but focus just on text for a moment,

15   and explain to me why the text is clear as to either of these

16   outcomes as opposed to looking, as it looks to me, like a

17   somewhat grammatically awkward formulation.

18           MR. COFFEY:  Well, I could refer your Honor to the

19   Moynihan affidavit, which is attached to Mr. Powhida's

20   declaration.

21           THE COURT:  No, no, no, no.  Not affidavits.  I'm

22   looking at text.  If you're inviting me to authorize discovery

23   into extrinsic events, into events relating to contract

24   formulation, I'm happy to go there.  I don't think that's at

25   all where you want to be.

L6N1BUSA

1          MR. COFFEY:  No, no.

2          THE COURT:  I want you to look at the text of the

3    agreement and tell me, just on the money sentence as to this

4    issue, I'm having difficulty with a plain language construction

5    of it that points with crystal clarity to either the earlier

6    time when BERG had stopped work or the later time when Pershing

7    pulls the ripcord on the investment.  Why does "in the event

8    that the case developed by BERG Associates is settled or

9    resolved..." why does the language clearly answer that

10   question?

11         MR. COFFEY:  Well, I think it does clearly answer it,

12   because the case developed by BERG relates to HLF, Herbalife,

13   and when that case -- even if it sat on a shelf, it sits there

14   for a while, when that case is settled or resolved, meaning

15   when the investment in Herbalife is closed out, that's when

16   Pershing Square would determine whether there was success or

17   not.  And to the extent, your Honor, that there is ambiguity

18   here -- and I will agree with you that this is not how you

19   would draft it.  It was drafted by BERG, and it was not edited

20   by Pershing Square.

21         THE COURT:  Sorry, but Mr. Coffey, just pause on that

22   for a moment.  I understand that there's a stage at the

23   contract interpretation sequence where one gets to *contra*

24   *proferentem*, you know, who did the authoring.  But that usually

25   is when you really have run out of everything else and that's

L6N1BUSA

1   sort of a tie-breaker of last resort.  I think the question

2   before we got there would be: is there some extrinsic evidence

3   on the contract formation process that bears on or helps

4   clarify the lack of textual clarity.  Anything you want to say

5   about that?  Did the parties discuss what that meant?  Does

6   anyone think there are notes that reflect communications across

7   the parties that speak to when the D-Day was for deciding, you

8   know, or assessing "settled or resolved"?

9           MR. COFFEY:  You know, your Honor, I have not delved

10  into that with the client because we feel that the contract

11  itself is unambiguous, is consistent with what the deal was

12  here, which was, they were going to try and find information

13  and see if it could help with the investment.  The investment,

14  when it was closed out, was a substantial loss.  They had been

15  paid their hourly rate and there wasn't going to be a success

16  fee.  Whatever you would say about the word "case," it

17  certainly wasn't, you know -- the investigation wasn't settled

18  or resolved at a time when they were asked to stand down, and

19  in fact, in the complaint itself, they continued to work, so

20  that case or file was still open.  So I do think that, you

21  know, viewing the entire agreement and what this was about,

22  which was to help Pershing Square in connection with its

23  Herbalife investment, that when you're talking about a success

24  fee term, the only sensible interpretation of "settled or

25  resolved" is when the investment is settled or resolved and the

L6N1BUSA

1    success of that investment can be assessed and therefore a

2    success fee paid or not paid.  So I think, you know, that's how

3    we view it.

4            THE COURT:  Okay.  Let me turn to a completely

5    different question, which is:  There's a contract claim and

6    then there's a claim about breach of the implied covenants.

7    I'm having a little difficulty understanding what the

8    difference is, because you have said, I think, to me in this

9    call, and I think persuasively, that there is an implication in

10   the agreement here that the denial of the success fee can't be

11   withheld arbitrarily, and I think maybe there's some intended

12   daylight or not between that end, meaning in bad faith, but I'm

13   treating those as essentially coextensive.  If that's the case,

14   whether through the implied covenant of good faith and fair

15   dealing or through contract interpretation, don't we

16   essentially come to the same place as to this, which is

17   Pershing was not allowed, in bad faith, to deny a success fee?

18           MR. COFFEY:  I would agree with that, your Honor.

19   They -- provided we're assessing the right decision, because

20   the argument that I'm seeing in the papers, which wasn't in the

21   complaint, is that it's focusing on a different decision and

22   that is that Pershing Square should have sold in March of 2015

23   when, you know, when this private investigative firm retained

24   to find facts and not give investment advice said you should

25   sell --

L6N1BUSA

1          THE COURT:  But Mr. Coffey, what you're saying is that

2     the plaintiff's complaint faults the failure to sell, not the

3     failure to give the success fee, and I certainly agree with you

4     that what you've tethered the good-faith discussion to is what,

5     from your perspective, is relevant, which is, there was an

6     obligation to make a judgment about the success fee, acting

7     only in good and not in bad faith.  I think you're conceding

8     that such an obligation existed.  Am I reading you right?

9          MR. COFFEY:  Yeah, it's implicit in the discretion

10    that the parties granted to Pershing Square that they not be

11    arbitrary or unreasonable in withholding a success fee.

12         THE COURT:  And I understand that.  Let me ask you

13    this then:  Why on the pleadings is there such a focus on your

14    part on dismissing the implied covenant claim?  I think I

15    understand your point to be, and not unreasonably, that the two

16    sort of collapse here but there's plenty of case law that

17    basically says while those two claims can't coexist at the end

18    of the day in a judgment, they can travel together down the

19    road some in the litigation while a court determines if there's

20    a binding contract and so forth, and there's really no harm

21    done in keeping the two of them coextensively alive during the

22    early stages of the case.  I'm trying to understand why this

23    appears to be important to your client.  You've got plenty of

24    arguments that have some force.  You've expressed them with

25    some force.  Why does it matter to send particular bows and

L6N1BUSA

1    arrows at the implied covenants claim?

2            MR. COFFEY:  Well, your Honor, because it's baseless

3    and -- the Count 2, paragraph 65 alleges that Pershing's

4    conduct in refusing to follow the recommendation to close its

5    positions was arbitrary or unreasonable and acted to prevent

6    BERG from enjoying the benefit of the hourly fee increase.

7    That is an allegation that fails as a matter of law.  The

8    notion that in this contractual relationship there was an

9    implied obligation for Pershing Square to say, oh, thank you,

10   BERG, you think we should sell?  We're the SEC-registered

11   investor, and nowhere in the contract does it say you're going

12   to give investment advice, but we have an implied obligation to

13   sell now because you've recommended --

14           THE COURT:  Mr. Coffey, just to cut you off, I think I

15   understand the point better now.  It's because the precise way

16   in which the amended complaint formulates the Count 2, that's

17   the reason for dismissing that count.  It's not that such a

18   claim couldn't, if formulated in some other way, perhaps, have

19   survived longer; it's because the only breach that's alleged is

20   the failure to sell, and therefore, it's not --

21           MR. COFFEY:  Yes, your Honor.  I think in fairness, we

22   did assert under New York law the two don't exist together, but

23   your Honor has pointed out that they may travel together, and

24   I'll concede that point.  But when you focus on the particular

25   allegations of Count 2, in this case, it's tying it to a

L6N1BUSA

```
1    separate decision, which is the decision not to sell.  And
2    we've cited to you the Lykins case and other cases that said as
3    long as there's a valid business reason -- let me back up.  The
4    assessment of whether the decision not to sell is, again, an
5    "arbitrary and unreasonable" standard, and the cases we've
6    cited, Lykins and others, say that, and as long as there's a
7    colorable business reason for Pershing not to have sold, it's
8    not conceivable that it could be viewed as arbitrary and
9    unreasonable, particularly given, you know, that it is an
10   implied covenant to a contract, and the contract is to a vendor
11   to go out and find facts, not to give investment advice.  So I
12   just wanted to make that clear that when you assess that
13   decision, the decision not to sell, the allegations in the
14   complaint are simply conclusory -- you know, we did it,
15   Pershing apparently did it to stiff BERG.  That's the bad faith
16   they allege.
17           THE COURT:  Right.  Your point is that doesn't make a
18   lot of sense because they would be leaving much more money on
19   the table; they stood to make a lot of money, and the idea to
20   stiff BERG of $3 million when they could have made a hundred
21   million doesn't make a lot of sense.
22           MR. COFFEY:  Correct, particularly when they still
23   had, even at that point in time, still had the discretion to
24   assess whether the information that had been gathered by BERG
25   was beneficial or not, which, again, you know, that's a fact
```

L6N1BUSA

1     issue not before your Honor and I don't seek to introduce it,

2     but --

3               THE COURT:  Understood.

4               MR. COFFEY:  Yeah.

5               THE COURT:  All right.  Mr. Coffey, very helpful.

6               Let me turn now to Mr. Della Rocca.  Happy to hear

7     from you.

8               MR. DELLA ROCCA:  Thank you, your Honor.

9               To start, I want to talk a little bit about the

10    contractual provisions, the contractual provisions as

11    interpreted by BERG from the beginning.  Mr. Coffey --

12              THE COURT:  Sorry, sorry.  I'm going to cut you off,

13    Mr. Della Rocca.  How BERG objectively interpreted the contract

14    provisions is utterly irrelevant.  Tell me about the contract,

15    not what BERG thought of it.

16              MR. DELLA ROCCA:  Well, the contract itself talks

17    about the case being developed by BERG, and BERG, being an

18    investigation firm, it's an investigative case, and then

19    settled and resolved when they were told to stand down.  Their

20    investigation ceased at that point.  And so at that point --

21              THE COURT:  Sorry, sorry.  Mr. Della Rocca, when you

22    hear me just trying to jump in, I'll ask you to defer to that.

23              MR. DELLA ROCCA:  Sure.

24              THE COURT:  You're confusing two things.  You're

25    melding the contract language and the chronology.  Let's start

L6N1BUSA

with the contract language and skip the chronology here.  Why
is it that the language of the contract means that the D-Day
for deciding financial benefit is when BERG is asked to stop
work?  Why does the contractual language necessarily get you
there?

MR. DELLA ROCCA:  Because the contractual language
deals with the investigation, period.  It doesn't -- they
weren't hired --

THE COURT:  It doesn't say investigation; it says
"settled."  How does an investigation by a PI firm settle?  I
mean, the problem is, it looks like somebody was sloppy, if I
may, in the drafting and sort of used some vestigial language
from an engagement that was keyed to a court case or
enforcement investigation by a regulator.

MR. DELLA ROCCA:  Well, your Honor, throughout the
contract, there is reference to investigation, and Pershing
Square would like to tie the "settled or resolved" to when they
closed the position.  However, the contract doesn't talk at all
about closing a position.  It doesn't talk at all about -- the
contract was entered into after Pershing started their short.
They hired them to help them out with the short.  It wasn't
tied in any way, and nowhere in the contract does it say that
it's tied to, Pershing Square closing its position.

THE COURT:  Given that the contract otherwise uses the
word "investigation," why would the formulation of the case

L6N1BUSA

1    being settled, why would that naturally be read to mean the

2    same thing as investigative work has terminated?

3         MR. DELLA ROCCA:  Because the entire contract is based

4    on developing an investigation, and --

5         THE COURT:  Of course.  But your firm no doubt has

6    done investigative work for clients who then proceed after you

7    have completed your investigative work to use it in a project

8    that continues, like a litigation or something, and so the fact

9    that you're doing investigative work doesn't answer the

10   question of what this clause is saying is the measuring point

11   for determining benefit to the financial standing of Pershing.

12        MR. DELLA ROCCA:  Well, in our interpretation, your

13   Honor -- and maybe, maybe there is some ambiguity there.

14   That's something that would need to be developed more in fact

15   discovery.  But the --

16        THE COURT:  Sir, pause on that.  Sorry.  Pause on that

17   then.  Throughout all this litigation, including an amended

18   complaint, strikingly there's been no allegation that the

19   meaning of these terms was something that was overtly discussed

20   among the negotiating parties during the course of the

21   negotiation of this agreement, and so I put it to you --

22   because if you don't know the answer now, I'm not going to give

23   you time to learn it -- what evidence affirmatively do you have

24   that would be developed in discovery aimed at contract meaning

25   that the parties discussed a meaning of this provision?  Is

L6N1BUSA

1   there any?

2           MR. DELLA ROCCA:  Your Honor, I don't have any at this

3   time.

4           THE COURT:  Okay.  So in effect I'm left with the

5   naked language here, and I'm being told multiple things about

6   what it might mean, but your position is that, I think as a

7   matter of plain language, "settled or resolved" means when BERG

8   ceased work, correct?

9           MR. DELLA ROCCA:  Correct, your Honor.

10          THE COURT:  All right.  Let's just indulge that for a

11  moment, although I will offer the thought that I am yet

12  unpersuaded that that language so clearly points to that as the

13  decision day.  But let's just go with that for a moment.  As of

14  the point at which BERG is told to stop work -- that's March of

15  2015, I think?

16          MR. DELLA ROCCA:  That is correct, your Honor.

17          THE COURT:  Okay.  As of that point, what is it that

18  obliged Pershing to sell?  In other words, Pershing may have

19  made a judgment that events are trending in its direction and

20  that if we wait longer, we'll profit-maximize.  What is it

21  exactly that obliged Pershing to sell or, if it failed to sell,

22  otherwise be held in bad faith for not giving you the success

23  fee?  Where does that come from?

24          MR. DELLA ROCCA:  Your Honor, BERG never told -- they

25  indicated that they should -- that it would be a good idea,

L6N1BUSA

1    after they were told to stand down, but they weren't trying to

2    push them.  They weren't trying to give them investment advice.

3        THE COURT:  Mr. Della Rocca, please listen to my

4    question.  I didn't ask you about that.  I'm saying where in

5    the agreement is there some obligation; what is it that you

6    base your supposition that Pershing had some obligation to sell

7    at the point that you stood down?  Why couldn't Pershing --

8    which is the investment shop and you're the, you know, private

9    eye shop -- what is it about the agreement that says that

10   Pershing had some duty to sell at that moment?

11       MR. DELLA ROCCA:  It has nothing, and your Honor, we

12   never said that they had a duty to sell at that moment.

13       THE COURT:  Okay.  So if they reasonably could have

14   decided not to sell because they concluded maybe because there

15   are multiple government investigations open that had the

16   potential to do further damage or open more holes in the hull,

17   why is it that Pershing, having reasonably decided not to sell

18   and then ultimately having the market run against them, how

19   does that entitle you to a success fee?

20       MR. DELLA ROCCA:  Your Honor, because we're measuring

21   the financial benefit to the company as of the date they told

22   BERG to conclude their investigation.

23       THE COURT:  But other than the fact that it is

24   self-serving, why, as a matter of contract law that it helps --

25   I mean, you know, it's a little bit like saying, you know -- I

L6N1BUSA

1    don't know.  I'll come up with a better analogue.  I had a

2    horse race one but it didn't work, so we'll stop it.  But let's

3    try it a little differently.  Let's suppose BERG had been asked

4    to stop, to stand down, and it didn't volunteer its *sua sponte*

5    investment advice but simply life went on, Pershing didn't

6    sell, market ran against it, it lost money.  Would you be

7    making the same argument?  Does your argument turn on BERG's

8    having given its investment advice?

9          MR. DELLA ROCCA:  Absolutely not, your Honor.  That's

10   a focus that Pershing Square is focusing on.  That's not what

11   our argument is, that it vests in the fact that they're giving

12   investment advice.  That's not our argument.

13         THE COURT:  Your view is that Pershing had received a

14   financial benefit based on the unrealized gain it had as of the

15   moment that BERG was asked to stand down.  Am I formulating

16   that right?

17         MR. DELLA ROCCA:  Absolutely, your Honor.

18         THE COURT:  How many mouths does that financial

19   benefit feed?  I don't understand how an unrealized benefit

20   sends a kid to school, puts bread on the table, pays the rent,

21   pays the electricity.  It's "coulda, woulda, shoulda."  What's

22   the benefit?

23         MR. DELLA ROCCA:  Well, your Honor, Pershing Square is

24   a hedge fund.  They wooed new investors by all of their assets

25   under management.  So that includes -- and it's primarily

L6N1BUSA

unrealized assets where they -- they're an investment company.
They show how well they can do, but they're not measuring their
only value by everything they sell and all the gains, by all
the realized gains.

THE COURT:  Would it be reasonable, though, for a
company in that line of business to measure success by cold,
hard cash?

MR. DELLA ROCCA:  I think that's unreasonable,
considering how they woo new investors.

THE COURT:  Okay.  So in other words, your position is
that for Pershing, the only reasonable way to determine benefit
to its financial standing is the money that it did not realize,
but it actually is unreasonable to measure it by the realized
gains or losses; is that what you're saying to me?

MR. DELLA ROCCA:  I think it's unreasonable to measure
it solely by realized gains.  I think it's reasonable to
determine the value, not solely by but as part of the
determination by including unrealized gains, yes.

THE COURT:  Why is it that your client agreed to a
provision then, if that's the position you're taking, that left
it to Pershing to make this determination?  It's utterly
silent, the agreement is utterly silent as to grasping on the
arguably counterintuitive notion that only the unrealized gains
are dominant and the realized ones are secondary.  You had to
understand that if you left the decision as to benefit to

L6N1BUSA

1    financial standing in the eye of the other side, you might not

2    get the outcome you want, which is one that makes unrealized

3    gains primary.  Why did your client do that?

4              MR. DELLA ROCCA:  Well, that's where the good faith

5    comes into play.  As we've argued, there's always the element

6    of good faith in contract law, and so part of it was they

7    expected Pershing Square to exercise good faith in its

8    determination.

9              THE COURT:  Right.  And are there any allegations

10   here, other than their failure to sell, that Pershing engaged

11   in bad faith?

12             MR. DELLA ROCCA:  Well, I mean, it's really just not

13   recognizing the financial benefit that BERG presented.  Part

14   of -- we didn't just say that the shares of Herbalife were

15   reduced.  There were reasons, there was information that BERG

16   uncovered -- and this was at a time where the market itself was

17   significantly going up.  Herbalife shares were going down.  And

18   it was during the time where BERG was conducting its

19   investigation, where a previous investigation firm that

20   Pershing Square had hired had failed.

21             THE COURT:  What possible interest, though, would

22   Pershing have had to hold onto a position if it thought the

23   position was going to run against it afterwards?  I mean, why

24   isn't Pershing's decision to hold almost definitially in good

25   faith because its self-interest laid in profit-maximizing?

L6N1BUSA

1        MR. DELLA ROCCA:  Your Honor, I can't answer why they

2    did.  I can only say what I have read, is that there was some

3    sort of personal vendetta, so to speak, that Bill Ackman had

4    against Herbalife.

5        THE COURT:  Right.  But in other words, you're the one

6    who said, you know, this is a company that measures itself by

7    how it presents to investors.  Insofar as you're keying your

8    case on the decision not to sell, you know, I take it had they

9    sold at that point, the profit they would have gotten would

10   have been worth, by a factor of some 30 or more, the amount

11   they would have had to pay in a success fee, right?  They would

12   have made a ton of money.

13       MR. DELLA ROCCA:  That's right, your Honor.

14       THE COURT:  Given that, I'm trying to understand how

15   the decision not to sell can be treated as bad faith as opposed

16   to perhaps bad forecasting?

17       MR. DELLA ROCCA:  It's not the decision not to sell.

18   The bad faith is in trying to link the value to their holding

19   onto the asset and three years later, liquidating or finalizing

20   the short.  That's the bad faith, because the bad -- BERG sent

21   a letter soon after March 2015 saying:  Look, look at all this

22   value we've provided you.  We'd like to get paid our success

23   fee.  And it's not linked solely to the failure to close their

24   position.  The link is their failure to actually use reasonable

25   standards to value the investment and the benefit that BERG

L6N1BUSA

1    brought to this.

2            THE COURT:  But isn't the other way to look at this as

3    follows:  Your client linked its fortunes as it related to the

4    success fee to a company that, for better or worse, is in the

5    gambling business, and you linked your fee to their subjective

6    assessment of realizing a financial benefit.  They ultimately

7    played the market wrong.  And you're a service provider.  You

8    rose up or down with them.  But why does that make their

9    conduct bad faith?

10           MR. DELLA ROCCA:  Because they're supposed to use a

11   reasonable determination in evaluating the work product

12   delivered by BERG, which they used throughout the short, and

13   even though they ended up losing money, that's not the point

14   where, again, they used this for investigations -- SEC,

15   different types of investigations, the DEA -- they used BERG's

16   information, so it's an evaluation of their work product, and

17   if that was a reasonable evaluation of their work product,

18   there was a benefit that Pershing Square received.

19           THE COURT:  But what's interesting is, the contract

20   doesn't say that.  It keys your entitlement to the success fee

21   to Pershing's determination of what was beneficial by standards

22   unsaid to its financial standing, not whether a reasonable

23   person would regard the information you dug up on Herbalife as

24   material.  That would have been a different way to put it, and

25   maybe you could have an arbitrator get assigned to make that

L6N1BUSA

1      assessment, but instead of putting an assessment as to the

2      objective value of your work in the hands of a neutral, you put

3      an assessment of financial benefit in the hands of your

4      counterparty, and now you're paying the price for that.  And I

5      have difficulty understanding why Pershing's decision not to

6      sell somehow or other entitles you to money.

7              MR. DELLA ROCCA:  Well, your Honor, we're not saying

8      that their decision not to sell entitles us to money.  We're

9      saying that the financial position that we helped Pershing

10     Square get into, the beneficial financial position, is what

11     entitles us to money, because at the time we were told to stand

12     down, the financial standing of the company --

13              THE COURT:  Mr. Della Rocca.

14              MR. DELLA ROCCA:  -- based -- yes, your Honor.

15              THE COURT:  Sorry.  But let me read you the sentence

16     and then tell me if you still agree, still adopt what you just

17     said to me.  Paragraph 65:  "Pershing's conduct in refusing to

18     follow the recommendation to close its positions was arbitrary

19     or unreasonable and acted to prevent BERG from enjoying the

20     benefit of the hourly fee increase."  I think you're saying

21     that the decision not to sell was what was unreasonable.  Yes

22     or no?

23              MR. DELLA ROCCA:  In that paragraph -- in that

24     paragraph, yes, your Honor.

25              THE COURT:  Well, that's the only paragraph that, for

L6N1BUSA

1    example, your Count 2 is based on.  And that's the one thing

2    that you say was unreasonable there.  You've disclaimed that

3    orally here today, but that's what your complaint says.

4             MR. DELLA ROCCA:  Well, your Honor, that's not the

5    only way that Pershing Square acted unreasonably.  And I think

6    the amended complaint spells out exactly what our argument is.

7    And --

8             (Audio interruption)

9             THE COURT:  Sorry.  I don't know what that was about.

10   Keep going.

11            MR. DELLA ROCCA:  Yes.  Had Pershing Square closed

12   their position at that time, they would have received a

13   significant benefit and there would be -- in my opinion, I

14   don't -- I don't think there would be any argument by Pershing

15   Square that my clients should receive that success fee.  The

16   argument -- or the disagreement is the benefit that BERG

17   provided to Pershing Square, and it's apparent in all of their

18   investment portfolios that BERG, with all of their

19   investigative work, provided a financial benefit, and the

20   contract itself does say that the decision from beneficial

21   status will be based on evaluation of work product delivered by

22   BERG Associates.

23            THE COURT:  Yes, but it also says that Pershing has to

24   determine that the case has been settled or resolved in a

25   manner that's beneficial to the financial standing.  The term

L6N1BUSA

"financial standing" and the term "beneficial" are undefined,

right?

MR. DELLA ROCCA:  Correct.

THE COURT:  And in this case there has to be some

deference to the person assigned the ability to make that

decision, which is Pershing, and I guess the money question

here is, you want financial standing to involve only unrealized

gains at that particular moment, and I'll come back to you and

ask you the final question:  Says who?  Why is it that only

your measure, which uses cold, hard cash, why is that the only

way a reasonable person could read those terms?  If I said to a

person on the street with some knowledge of the economy, you

know, which of the following two things is beneficial to your

financial standing, having a stock that you owned temporarily

go up but you don't take any option on it, or having a stock

temporarily go up and you sell at the pinnacle?  And I have a

hunch the answer wouldn't come out the way you want.

MR. DELLA ROCCA:  Well, sure, but we're dealing with

an investment company, and that's how they determine their

value, by looking at all of the assets under management, and,

you know, I think that it's reasonable to interpret the

contract that we have.  It's reasonable to think that BERG was

hired after Pershing Square started their short.  They were

asked to help out.  And there was -- the benefit was shown

throughout their time, and then when they were asked to stand

L6N1BUSA

1    down, it's a reasonable interpretation to say, all right, well,

2    let's look at this financial standing of the company at that

3    time, as far as its investment in Pershing Square -- or I'm

4    sorry, in Herbalife -- and let's make the assessment at that

5    point because BERG no longer has any control whatsoever to

6    influence this anymore.

7            THE COURT:  Right.  But BERG also negotiated to

8    surrender that control as it related to the success fee.  In

9    other words, this isn't BERG's first rodeo.  Presumably you've

10   had other success with contracts, right?

11           MR. DELLA ROCCA:  Your Honor, I don't know if they

12   have, honestly.

13           THE COURT:  I mean, presumably a menu option to them

14   in negotiating this would have been some other measure of the

15   success fee, whether based on the stock price at a particular

16   time, based on a neutral's evaluation of the inherent value of

17   the data that was unearthed, or something like that, and

18   instead, its discretion, subject only to good faith, was ceded

19   to Pershing.  I mean, you at least agree that while you define

20   good faith in a particular way, under the agreement, as long as

21   Pershing made its determination in good faith about whether

22   there had been financial benefit, they had latitude to act,

23   right?

24           MR. DELLA ROCCA:  Yes, as long as they acted in good

25   faith, yes, your Honor.

L6N1BUSA

```
1        THE COURT:  And so then the question is:  Their

2   decision not to sell, why is that in bad faith?  Or why is

3   their decision not to pay you money at a time when they had not

4   received any concrete financial benefit, only an unrealized

5   paper benefit, why is that not in good faith?  I mean,

6   ultimately that's what it comes down to, right?

7        MR. DELLA ROCCA:  That's what it comes down to, and I

8   think that you've been presented with different

9   interpretations, reasonable interpretations of the contract,

10  and so, I mean, what it comes down to is whether Pershing

11  Square acted reasonably and in good faith under the contract.

12  BERG, when they were told to stand down, they sent a letter

13  outlining exactly how they felt.

14        THE COURT:  I understand.

15        MR. DELLA ROCCA:  They felt that at that point it was

16  the time.

17        THE COURT:  So let me just go back to the contract.

18  Just a question or two more.  I'm turning again to the critical

19  provision, the one that starts, "In the event."  And it talks

20  about --

21        (Audio interruption)

22        THE COURT:  Sorry.  Mr. Della Rocca, are you still on

23  the line?

24        MR. DELLA ROCCA:  Yes.  Yes, I am.

25        THE COURT:  Mr. Coffey, are you still on the line?
```

L6N1BUSA

1          MR. COFFEY:  I am, your Honor.

2          THE COURT:  And Ms. Sellin, are you still on the line?

3          THE REPORTER:  Yes, I'm here, your Honor.

4          THE COURT:  All right.  No accounting for what Siri's

5     voice intended there, but we'll go ahead.

6          So look, turning to the critical provision, which

7     makes a lot turn on whether Pershing determined that the case

8     had been settled or resolved in a manner beneficial to its

9     financial standing, is there any allegation here that Pershing

10    ever made that determination?

11         MR. DELLA ROCCA:  No.  I mean, other than the fact

12    that they refused to pay it, we don't know whether they -- how

13    they made that determination.

14         THE COURT:  Right.  Okay.

15         All right.  Look, Mr. Della Rocca, I put you through

16    your paces.  Let me give you a minute or two before we wrap up,

17    if there's anything you want to add, uninterrupted by me.

18         MR. DELLA ROCCA:  I mean, I pretty much said

19    anything -- I guess part of what I wanted to emphasize is that

20    BERG was hired after the investment started.  Nothing was tied

21    to the conclusion of that investment.  It was to help with that

22    investment.  And there's nothing in the contract that says that

23    it was tied to the conclusion of that investment.  BERG saw its

24    role as investigation, as doing an investigation.  When they

25    were told to stand down, that's when it ended.  And as an

L6N1BUSA

1    investment company, investment companies are valued based on

2    their assets under management, and that's how BERG interpreted

3    the contract.  That's how BERG evaluated the beneficial status

4    that they provided to Pershing Square.

5            THE COURT:  Okay.  All right.  Mr. Della Rocca, thank

6    you.

7            Mr. Coffey, just a minute or two if you need it.  Any

8    rebuttal?

9            MR. COFFEY:  No, your Honor.  I think you've covered

10   the waterfront and I would just be repeating myself, so I'll

11   stand down.  Thank you.

12           THE COURT:  All right.  Look, very good.  Thank you.

13   It's an interesting case, and like the most interesting cases,

14   you know, there's messy language here and so there's some stuff

15   to work through here, but I appreciate the very helpful briefs

16   and I appreciate the helpful arguments today, including,

17   Mr. Della Rocca, your standing up under some fire.

18           So look, I'll take the case under advisement, and

19   you'll hear from me in due course.  Thanks, everyone.  I wish

20   everyone good health and a good summer.  Thank you.

21           MR. COFFEY:  Thank you, your Honor.  Thanks, Brian.

22           MR. DELLA ROCCA:  Thank you.

23                              o0o

24

25